**Gordon HAZELL, d/b/a Bonanza Realty, Appellant,**

v.

**Frederick RICHARDS, Appellee.**

No. 6683.

Supreme Court of Alaska.

Feb. 18, 1983.

Randall Simpson, Jermain, Dunnagan & Owens, Anchorage, for appellant.

Steven P. Oliver and Paul J. Nangle, Anchorage, for appellee.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

OPINION

MATTHEWS, Justice.

In this dispute over a vendor's liability for a real estate sales commission, the facts are largely undisputed. The issue, on appeal from a summary judgment in the vendor's favor, is whether as a matter of law the real estate broker was entitled to a commission under his contract with the vendor.

Don Kling, a real estate agent employed by Bonanza Realty, a firm run by broker Gordon Hazell, induced Frederick Richards to sign an exclusive listing agreement on a duplex owned by Richards, at a price of $88,500.

The listing agreement stated in part:

This agency shall continue irrevocably for the full period beginning June 17, 1980, to midnight Aug. 17, 1980. Owner agrees to pay Agent six percent of the selling price as compensation if the property is sold or transferred by anyone, including Owner, during the contract period or if sold or transferred within __ days after expiration of that period to anyone who negotiated during the period of this agreement with Agent or any other person authorized by Agent to sell or negotiate for the sale of the property.

If an earnest money offer meeting the price and terms stated above is received and presented to Owner prior to the expiration of this agency, Owner agrees that the Agent shall be allowed 25 days to close or secure the closing of the transaction.

If a deposit is forfeited by a prospective purchaser, the deposit shall be paid to or retained by Agent to the extent of the specified commission and any residue shall be paid to Owner.

On July 14, 1980, Richards signed an earnest money contract, consisting of his ac-

ceptance of an offer by Samuel Krogstad, a prospect found by Kling. The offer allocates the cost of "broker's fee" to the vendor. The offer states in part:

1. 45 days allowed from date of seller's acceptance for search of title and completion of purchase. If title proves good and purchase is not completed within said period, the said deposit shall be forfeited by purchaser.

. . . . .

9. Time is the essence of this contract but either agent may, without notice, extend for a period of not to exceed 45 days the time for the performance of any act hereunder except the time for the acceptance hereof by seller.

The acceptance states in part:

I agree to pay forthwith to [Bonanza Realty] a commission amounting to $5310 for services rendered in this transaction. In the event of a forfeiture of the deposit as above provided, the said deposit shall be paid to or retained by the real estate firm to the extent of the agreed upon commission with residue to the seller.

An addendum to the earnest money contract, executed July 26, states in part, "Buyer to apply for and obtain F.H.A.– V.A./State-V.A. loan in the amount of $85,- 950." Another phrase states "Buyer may occupy premises any time after the first day of August and to pay $400.00 per month". Krogstad took possession of the property and moved into one of the units shortly thereafter.

In attempting to secure financing it was discovered that the duplex was not properly linked with the municipal sewer system, and that a loan could not be made until a proper link was made or funds were escrowed for that purpose. The estimated cost for the hookup was over $5000, including city assessments. Richards thought perhaps Krogstad would split the cost of the new hookup with him,[1] and he called

around about getting the job done. He discovered that "[he] couldn't get ahold of anybody to do the work for at least six weeks, which was going to be in the freeze- up." Accordingly, he decided to remove the duplex from the market.

Richards and Krogstad met with Hazell on October 3, and at the meeting Richards told Krogstad of his decision. Krogstad reluctantly agreed to withdraw his offer, and Richards agreed to return the earnest money deposit. Hazell, in accordance with his standard practice, did not demand what he regarded as his already-earned commission, since the deal had not closed. According to both Richards and Krogstad, there was no attempt to negotiate an arrangement concerning the hookup; Richards simply stated that he was withdrawing, and Krogstad acquiesced. Hazell's testimony does not contradict this version of the events.

A week or so later, Krogstad decided to make another effort to close a deal on the duplex. He had not at that point vacated the property. He called Richards, and the two "were ... able to come to terms." Krogstad arranged to get the sewer hookup job done and "supervised the project", which included doing some of the work himself. Richards agreed, on that basis, to pay the entire cost of the hookup. The job and assessments cost just under $4000.

On cross motions for summary judgment, Hazell argued that the execution of the earnest money contract in July constituted a "sale" within the meaning of the listing agreement, and that he was therefore entitled to a commission. He contended that a commission was not barred by the fact that the sale was closed after the expiration of the listing agreement. This view is supported by former AS 08.88.361 (amended 1980), in effect at the time of this transaction,[2] which stated:

ards wouldn't pay the entire cost. Krogstad told Hazell that that was his position, and the meeting with Richards followed.

**1.** According to Krogstad, Hazell informed him that Richards would insist on this. Krogstad consulted an attorney, who advised him that it was not worth contesting liability for the sewer linkup, and to forget about the duplex if Rich-

**2.** AS 08.88.361 was amended by ch. 167, § 28, SLA 1980 so that it now states:

*When commission is earned.* A commission is earned when the real estate broker finds a buyer willing and able to purchase at a price and on terms set by the seller, providing negotiations with the buyer were initiated during the term of a valid listing agreement and within the time limit of the listing.

Hazell also argued that the vendor waived any condition as to the time of closing.

Richards argued that the listing agreement conditioned payment of a commission upon a closing within the time limit set by the agreement, and that since the transaction closed outside those limits no commission was earned. He further argued that any right to a commission was lost when the sales transaction was terminated on October 3.

The superior court granted summary judgment in Richards' favor and Hazell appeals.

Hazell's primary argument on appeal is that a property is "sold" within the meaning of a listing agreement when an earnest money contract is signed, regardless of whether the sale closes prior to the expiration of the listing agreement, so long as it at some time results in a completed transaction. This argument is, as a general proposition, a valid one, but it does not necessarily take into account the specific language of the listing agreement, the extrinsic evidence, and Richards' argument based on that evidence. Richards' position is that closing the sale within twenty-five days of the earnest money contract was a condition of the duty to pay a commission, pursuant to this provision in the listing agreement:

> If an earnest money offer meeting the price and terms stated above is received and presented to Owner prior to the expiration of this agency, Owner agrees that the Agent shall be allowed 25 days to

close or secure the closing of the transaction.

Regarding this provision, Richards testified in his deposition as follows:

A. He also wanted 45 days down there.

Q. Yeah, I was going to ask you about that.

A. And I said absolutely not. Twenty-five days maximum. In fact, I didn't want to give him any time on that. At the end of 60 days, we discussed that point, and he said, well, if they had done any work with the potential buyer, that they would need a minimum of 25 days, or they would need—That's what he said: 25 days, they could have it closed.

   I said, "If you can have it closed in 25 days from that date of August 17th," I said, "that's the maximum I'll give you." I didn't want to give him any time on that. He wanted 45, and I said, "Okay, I'll go for that, Don."

Q. Why didn't you want to give him any time?

.        .        .        .        .

A. I've explained it. I had a piece of property over at Knik that I wanted to buy. It was a very nice piece of property, and the time was of the essence to get this thing sold, so I could cash the person out on that piece of property over there.

There is no other evidence concerning this time limit relevant to the expressed intent of the parties prior to entering the contract, and Richards' testimony concerning the contract as a whole was unimpeached and uncontradicted.

Since there are no factual disputes concerning the extrinsic circumstances relevant to the interpretation of the contract, its meaning is a question of law,[3] and we will

---

*When commission is earned.* A commission is earned when the real estate broker fulfills the terms of a written personal services contract.

3. *See Peterson v. Wirum,* 625 P.2d 866, 869–70 (Alaska 1981):
   [S]ummary judgment is inappropriate when the affidavits and other evidence before the

trial court establish that a factual dispute exists as to the *expressed intent* of the parties.... But [if] the evidence before the superior court at the time of the cross-motions for summary judgment did not indicate any dispute as to the material facts pertain-

enforce that interpretation which is most reasonable in light of the terms and circumstances. *See Dahl v. Griffin,* 652 P.2d 84, 87 n. 6 (Alaska 1982); *Starry v. Horace Mann Ins. Co.,* 649 P.2d 937, 939 (Alaska 1982).

Richards' testimony is, in our opinion, insufficient to establish that the twenty-five day limit was a "condition" to the duty to pay a commission, given the specific agreement to pay on "sale." We read the twenty-five day limit, and Richards' testimony, as establishing the terms which Richards could have insisted on in entering a contract of sale.[4] In fact he did not insist on a twenty-five day closing limit. Instead the limit was set at forty-five days, extendable by the agent for another forty-five days. At the expiration of that time limit it may be that Richards could have walked away from the earnest money agreement without incurring liability either to the prospective buyer or the broker. But it is quite another thing to say that Richards could refuse to carry through on the earnest money contract and then sell to the same prospect without incurring liability for a commission. Nothing in the listing or in the earnest money contract suggests that such a result was contemplated.

By contrast, Hazell's interpretation is consistent with the language of the listing agreement. In the "sale after expiration clause" of that agreement, the blank for days was marked through, but the remaining language of the clause was left intact. The clause was thus effective for a reasonable time.[5] When this clause is considered it is obvious that the expiration of the closing limit does not eliminate Richards' liability for a commission. If it did, the clause would be without meaning. Further, this result is consistent with the manner in which listing agreements are generally interpreted.[6] Accordingly, we hold that the contract entitled Hazell to a commission if the sale to Krogstad closed within a reasonable period of time.

Having made this determination, it follows that on the facts of this case, Hazell was entitled to a commission. The evidence is uncontested that Hazell's "abandonment" of the contract at the October 3 meeting was in accordance with his policy of not demanding payment of commissions if sales did not close. When the sale did in fact close approximately one week later, under the terms of the listing agreement Hazell became entitled to 6% of the selling price.

We therefore REVERSE the judgment, and REMAND for entry of a judgment in Hazell's favor.

---

ing to the intent of the parties [then] summary judgment is appropriate.... Difference of opinion among the parties as to their subjective intent, expressed during the litigation, do not establish an issue of fact regarding the parties' reasonable expectations at the time they entered into the contract, since such self-serving statements are not considered to be probative. Rather, the court must look to express manifestations of each party's understanding of the contract in attempting to give effect to the intent behind the agreement. (Emphasis added; citations and footnotes omitted.)

**4.** Interpreting the provision in this manner comports with the general principle of contractual construction favoring promises over conditions. *See* Restatement of Contracts § 261 (1932); *see also* 3 L. Corbin, *Corbin on Contracts* § 559, at 265 n. 10 (1960).

**5.** Similar treatment was given to a similar situation in *Stromberg v. Seaton Ranch Co.,* 160 Mont. 293, 502 P.2d 41, 49 (Mont.1972); *see*

*generally* Annot., 51 A.L.R.3d 1149, 1214–16 (1973).

**6.** Restatement (Second) of Agency § 445 comment e (1958) states:

[T]he principal's promise to pay a commission becomes binding upon the production by the broker of a customer ready, able, and willing to consummate the transaction on the specified terms. This promise, although now binding, does not call for performance unless there has been a fulfillment of the further condition, either that such customer shall make a contract enforceable against him, or that the conveyance shall be consummated, except that if the principal is responsible for the nonperformance of such condition, it is dispensed with and the promise to pay the commission becomes unconditional.

*See generally* Annot., 26 A.L.R. 784 (1923); Annot., 27 A.L.R.2d 1348 (1953); Annot., 46 A.L.R.2d 848 (1956); Annot., 51 A.L.R.3d 1149 (1973).